IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARTIN J. WALSH,                                )
                                                )
                    Plaintiff,                  )        2:19-CV-00546-CCW
                                                )
        v.                                      )
                                                )
ELDER RESOURCE MANAGEMENT,                      )
INC.; STAFF SOURCE, INC.; ANNA                  )
ZAYDENBERG; and MARSHA SIMONDS,                 )
                                                )
                    Defendants.                 )
                                                )
                                                )

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having conducted a Non-Jury Trial, ECF Nos. 192, 193, & 194 and considered the

parties briefing and proposed findings and conclusions on the same, ECF Nos. 207, 208, 213,

214, 217, 218, & 221, the Court makes the following Findings and Conclusions by a

preponderance of the evidence.

## I.   FINDINGS OF FACT REGARDING FACTUAL AND PROCEDURAL BACKGROUND

1.   Investigator Crystal Bibri of the United States Department of Labor, Wage and Hour
     Division, investigated the Defendants' pay practices for the period of July 5, 2014, through
     June 24, 2017.  ECF No. 202 at 188:17–189:3;  Ex. D-14.

2.   The "relevant time period" is November 12, 2015, through the workweek ending June 24,
     2017.  ECF No. 136 ¶ 4.

3.   Defendant Elder Resource Management, Inc. ("ERM") is owned by Defendant Anna
     Zaydenberg and located at 4374 Murray Avenue, Pittsburgh.  ECF No. 214 ¶ 6.

4.     ERM employed all of the Schedule A Employees[1] during the relevant time period (the "Caregivers").  ECF No. 136 ¶ 5;  ECF No. 214 ¶ 3.

5.     Ms. Zaydenberg is a sophisticated businesswoman with knowledge of complex Medicaid regulations.  ECF No. 203 at 67:1–10, 108:2–12.

6.     Ms. Zaydenberg purchased a ComForCare franchise in December 2007.  By November 2015, ERM had grown from serving "a couple" of clients to one of the largest unskilled medical care agencies in Allegheny County, Pennsylvania, employing more than 300 employees.  ECF No. 203 at 55:17–56:12, 139:22–140:9.

7.     Since 2009, Lev Zaydenberg, the husband of Ms. Zaydenberg and the father of Defendant Marsha Simonds, was employed by ERM as a payroll clerk.  ECF No. 203 at 4:19.

8.     Defendant Staff Source was founded in 2014 by Ms. Simonds, who is the daughter of Ms. Zaydenberg and Mr. Zaydenberg.  ECF No. 136 ¶¶ 6, 8.

9.     While she was working at ERM in 2012, Ms. Simonds had the idea to create a staffing company to fill gaps in care when it is difficult to find a caregiver.  ECF No. 203 at 89:3–16.

10.    Ms. Zaydenberg lent her daughter up to $100,000 to start a staffing company.  ECF No. 203 at 142:14–143:6.

11.    ERM and Staff Source entered into a staffing contract in April 2014.  Ex. D-1 (the "Staffing Agreement").

12.    The Staffing Agreement was a way to address the issue that Caregivers' hours needed to be limited to comply with the Affordable Care Act ("ACA") and to ensure that the

---

[1] On May 10, 2019, the Secretary of Labor filed a Complaint seeking, among other relief, judgment pursuant to Section 16(c) of the Fair Labor Standards Act finding Defendants liable for unpaid minimum wage and overtime compensation due to certain of Defendants' current and former employees listed in the attached Schedule A.  ECF Nos. 1 & 1-1.

Caregivers remained eligible to receive insurance through the Exchange. ECF No. 202 at 102:13–103:14;  ECF No. 203 at 93:23–95:7, 153:22–154:22, 155:6–23.

13.     After Staff Source was founded, it hired many of ERM's caregivers, who performed domestic services for ERM clients while employed at Staff Source.  ECF No. 203 at 28:13–17, 145:7–12;  ECF No. 214 ¶¶ 16, 19.

14.     Staff Source did not have its own consumer clients.  ECF No. 203 at 26:23–25;  ECF No. 214 ¶¶ 19, 24, 30.

15.     Beginning in 2014, Mr. Zaydenberg did payroll for Staff Source, but was not paid to do so. ECF No. 203 at 8:25–9:14.

16.     Staff Source has not employed any employees since 2018, and Defendants represent that Staff Source is no longer in business. Ex. J-12 at 22:10–19;  ECF No. 213 at 24;  *see also* ECF No. 218 ¶ 196.

17.     During the relevant time period, the Caregivers provided domestic care services exclusively to clients of ERM.  ECF No. 202 at 5:17–18, 20:12–14, 67:18–21; ECF No. 203 at 28:13–17;  ECF No. 214 ¶ 23.

18.     ERM hired Caregivers in two ways.  Approximately 60% of the time, clients approached ERM with a Caregiver in mind (often, but not always, a family member).  These were referred to as "Directed," "Direct," or "Self-Directed" Caregivers" at trial (the "Direct Caregivers").[2]  ECF No. 203 at 60:8-13, 63:25–64:3.  Approximately 40% of the time,

---

[2] Although used both parties referenced "Directed" or "Direct"" Caregivers at trial, the Department of Labor objected to this term and to questioning related to such term on several grounds.  However, as discussed further below, whether a Caregiver was a "Direct Caregiver" as opposed to an "Indirect Caregiver" does not have a determinative effect on the joint employment question as applied in this case.  Thus, the Court need not address the Department of Labor's contention that Defendants are precluded from making such arguments.

ERM hired the Caregivers in the traditional manner, such as through job fairs or advertisements ("Indirect Caregivers").  ECF No. 203 at 64:4–10, 65:25–66:6.

19. Some, but not all, of the Direct Caregivers live in the same home as the consumer they care for.  ECF No. 203 at 64:11–17, 210:21–211:9.

20. Ms. Zaydenberg and ERM Managers Jennine DiLembo and Jennifer Carey oversaw the performance of the English-speaking Caregivers, whereas ERM Manager Irina Blaushiod oversaw the performance of the Russian-speaking Caregivers.  ECF No. 203 at 25:19–26:8.

21. Caregivers Tiffany Ammon, Asia Green-Brown, and Kayla Jackson all received two paychecks—one from Staff Source and one from ERM.  ECF No. 203 at 11:20-25 (Jackson), 42:23–43:22 (Ammon), 56:55–13, 123:8–14 (Green-Brown);  *see also*, Ex. P-3D.

22. Ms. Ammon, Ms. Green-Brown, and Ms. Jackson each cared for multiple different consumers.  ECF No. 203 at 9:8–14 (Jackson), 41:10–18 (Ammon), 52:11–13 (Green-Brown).

23. Ms. Laverne Lawson cared for her mother.  ECF No. 202 at 70:22-24.

24. Although Ms. Lawson and Ms. Ammon filled out Staff Source applications, Ex. J-4 at SS014283, SS014467;  ECF No. 202 at 70:6–16), based on their demeanor at trial (and the substantial similarities between the ERM and Staff Source application, *see* Finding of Fact ¶ 28), their testimony that they only learned about Staff Source when they received their W-2 was credible.  ECF No. 202 at 69:6–8 (Lawson);  ECF No. 202 at 24:2–5 (Ammon).

25. Ms. Jackson was not aware of Staff Source and did not know who Ms. Simonds was.  ECF No. 202 at 12:1–10.

26.     Investigator Bribri learned from other Caregivers during the course of her investigation that they were also receiving two checks. ECF No. 202 at 117:6–9; Ex. P-3A (Agafonova); ECF No. 202 at 120:5–12; Ex. P-3B (Bailey). The Caregivers identified the two checks as coming from ERM and Staff Source, but had not applied to work for Staff Source. ECF No. 202 at 121:12–122:4; Ex. P-3C (Bupp); ECF No. 203 at 124:13–125:5; Ex. P-3F (Labbie).

## II.     FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING JOINT EMPLOYMENT

### A.  Findings of Fact Regarding Joint Employment

#### i.     Employer's Ability to Hire and Fire Employees

27.     Defendants maintain that Staff Source did not simply "pay" the Caregivers, but also "hired" and "employed" them. ECF No. 214 ¶¶ 7, 29, 30.

28.     The ERM and Staff Source applications are almost identical except for the logo at the top. The completed Staff Source applications state that Caregivers were applying for "ComForCare,"[3] because Ms. Zaydenberg allowed Ms. Simonds to copy the ERM form. *Compare* J-3 *with* J-4; ECF No. 203 at 149:24–151:15.

29.     Some Caregivers filled out both Staff Source and ERM applications. *See* ECF No. 218 ¶ 71 (detailing Bates numbers).

30.     In 2015–2017, ERM would not hire anyone with a criminal record. Further, ERM was able to decide if it did or did not want to hire Direct Caregivers from Medicaid. ECF No. 203 at 69:22–23, 169:14–18.

---

[3] ComForCare was ERM's franchisor. ECF No. 203 at 55:24–56:2.

> ii.    **Employer's Authority to Promulgate Work Rules, Assignments, and to Set Terms of Employment**

31.   ERM tells potential employees, including Direct Caregivers, what rate it is willing to pay and the prospective Caregiver may either accept or reject employment at that rate.  ECF No. 203 at 68:21–69:1.

32.   ERM required Staff Source to pay Caregivers at the same hourly rates they received at ERM. J-11 at 87:16–19.

33.   All Caregivers reported their hours worked using two systems:  paper time sheets and Teletime.[4]  ECF No. 203 at 5:22–6:6, 74:14–17, 182:1–25.

34.   The Teletime system did not distinguish whether the inputted hours corresponded to ERM hours or Staff Source hours.  ECF No. 203 at 11:20–23, 184:24–185:3, 186:5–8.

35.   The Teletime reports did not indicate whether the Caregivers' hours should be paid by ERM or Staff Source.  Ex. D-11;  ECF No. 214 ¶ 58.

36.   ERM reported all hours to the relevant government agency and ERM was paid by the agency for all of those hours.  ECF No. 203 at 183:5–13;  ECF No. 204 at 19:14–22.

37.   ERM management trained all new Caregivers at the Murray Avenue location, whether the Caregivers cared for family members or took assignments with clients who were not related to them.  ECF No. 202 at 51:20–23 (Green-Brown), 66:17 (Lawson).

38.   Caregivers participated in an initial training at the Murray Avenue location in which they learned how to record their time, met the office staff, and learned who to call if there is an issue.  ECF No. 203 at 84:21–85:4.

---

[4] When using Teletime, Caregivers dialed a number from their clients' home telephones. The Caregivers entered codes to show their identity, their arrival time, the tasks they performed, and their departure time. ECF No. 203 at 182:4–16.

39.    ERM would provide training to all Caregivers who needed training, and ERM had a minimal standard of training required of all Caregivers.   ECF No. 203 at 190:25–191:1, 191:24–192:17.

40.    The ERM employee handbook was the only employee handbook given to Caregivers, including Direct Caregivers.   Ex. D-2;   ECF No. 204 at 19:4–10.

41.    No handbook for Staff Source was produced in this case.   Ex. J-9 ¶ 4 (Responses to Document Requests).

### iii.   Employer's Involvement in Day-to-Day Employee Supervision

42.    Pursuant to the Staffing Agreement, ERM was responsible for the "supervision, direction, and control of [Staff Source employees] when at [ERM's] work site."   Ex. D-1.

43.    Mr. Zaydenberg, Ms. Zaydenberg and ERM managers periodically called ERM's clients to ensure that they were satisfied with their Caregivers, however they did not "usually" do this with Direct Caregivers.   ECF No. 203 at 25:4–18, 72:7–22.

### iv.   Employer's Control of Employee Records

44.    ERM and Staff Source shared a single Teletime account.   ECF No. 203 at 11:17–19.

45.    Mr. Zaydenberg received Teletime reports on his computer that showed the hours that the Caregivers worked, but not whether those hours should be paid by ERM or Staff Source.   ECF No. 203 at 7:4, 11:20–23.

46.    To pay Caregivers, Mr. Zaydenberg first gathered paper and electronic timesheets that were submitted by Caregivers to ERM.   ECF No. 203 at 5:22–6:6.

47.    Before running payroll, Mr. Zaydenberg received a list from an unknown individual who worked in the office describing what hours should be attributed to Staff Source.   ECF No. 203 at 12:2–13.

48. Based on their demeanor at trial and the extent of their involvement in managing ERM, the Court finds Mr. Zaydenberg's and Ms. Zaydenberg's inability to recall who made the list not credible.  ECF No. 203 at 12:7–13, 186:9–23;  ECF No. 204 at 20:11–23.

49. Each bi-weekly pay period, Mr. Zaydenberg combined the electronic and paper timesheets into two EXCEL spreadsheets:  one for ERM and another for Staff Source.  ECF No. 203 at 8:1–3.

50. Based on the list, Mr. Zaydenberg allocated a portion of the Caregivers' hours to the EXCEL spreadsheet for Staff Source, and the rest of the hours to the spreadsheet for ERM.  ECF No. 203 at 3:14–17, 4:25–5:21, 12:7–13, 186:9–23;  ECF No. 204 at 20:11–23.

51. Mr. Zaydenberg sent the two EXCEL spreadsheets—one for the bi-weekly hours to be paid on ERM's payroll and the other on Staff Source's payroll—to the Paychex software program. ECF No. 203 at 5:12–15, 10:10–14.

52. Paychex computed overtime premium pay only when the EXCEL spreadsheets showed that a Caregiver had worked more than 80 hours in a two-week pay period for ERM, or separately, for Staff Source.  Paychex did not combine hours worked between ERM and Staff Source before computing the overtime premium pay.  Ex. J-1;  Ex. J-2;  ECF No. 214 ¶ 67.

53. The Staffing Agreement requires Staff Source to submit invoices to ERM on a bi-weekly basis.  Ex. D-1.

### v.  Additional Factors

54. Based on her demeanor at trial, Ms. Zaydenberg's repeated testimony that she knows nothing about the operations of Staff Source is not credible.  ECF No. 203 at 183:21–184:11 (disputing knowledge of whether Staff Source paid Caregivers);  ECF No. 203 at 142:9-144:14 (disputing recognition of daughter's signature).

55. Ms. Simonds was not present at or involved with Staff Source during most of the relevant time period and she did not read documents related to Staff Source or ERM that were sent to her.  J-12 at 80:21–23, 81:8–10.

56. During the relevant time period, all 345 Caregivers provided domestic care exclusively to ERM clients.  ECF No. 203 at 28:13–18.

57. Caregivers who served only a single client were paid by both ERM and Staff Source.  Ex. P-1;  ECF No. 202 at 66:24-65:2, 69:6-8 (Lawson);  ECF No. 203 at 72:14-16 (N. Biswa), 46:5-12 (H. Biswa);  P-3F (Labbie).

58. Staff Source did not have its own consumer clients.  ECF No. 203 at 26:23-25;  ECF No. 214 ¶ 19.

59. The bank records from ERM and Staff Source show that 99 percent of the money deposited to Staff Source's bank account during 2016 came from ERM.  P-4;  P-5.

60. During 2016, all but two deposits into the Staff Source bank account matched withdrawals by cash or check from the ERM bank account.  P-4;  P-5.

61. The deposits to Staff Source from ERM were worth more than $3.3 million and the deposits from other sources were worth $1,228.  P-4;  P-5.

62. Ms. Zaydenberg told all of the ERM employees that if they wanted to work more than full time hours, they should apply through a staffing agency.  ECF No. 203 at 153:16–155:23.

63. ERM used other staffing companies before Staff Source, and also has been used itself as a staffing company.  ECF No. 203 at 85:5–8.  Staff Source, instead, paid Caregivers who were already working for ERM.  ECF No. 203 at 154:5–155:7.

64. Ms. Zaydenberg was aware of that distinction because she had used actual staffing companies in the past. ECF No. 203 at 85:5–8.

### B. Conclusions of Law Regarding Joint Employer Status

65.  The Caregivers are individually covered by the FLSA.  Finding of Fact ¶ 17.  *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 694 (3d Cir. 1994) (Individual coverage under the FLSA can be established if an employee is "engage[d] in commerce or in the production of goods for commerce." (citations omitted));  29 U.S.C. § 202(a)(5) ("the employment of persons in domestic service in households affects commerce").

66.  To prove a violation of the FLSA, the Department of Labor need not have every employee seeking back wages testify—representative employees may prove violations with respect to all employees.  *Gateway Press, Inc.*, 13 F.3d at 701–02.

67.  "Once the pattern is established, the burden shifts to the employer to rebut the existence of the violations [] or to prove that individual employees are excepted from the pattern or practice."  *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1298 (3d Cir. 1991).

68.  Under the FLSA, "economic reality rather than technical concepts is to be the test of employment."  *In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 683 F.3d 462, 467–68 (3d Cir. 2012) (quoting *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961)).

69.  Employer is defined "expansively," *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326, (1992), and with "striking breadth" under the FLSA.

70.  "'[W]here two or more employers exert significant control over the same employees—[whether] from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment—they constitute "joint employers"' under the FLSA."  *In re Enterprise*, 683 F.3d at 467–68 (quoting *N.L.R.B. v. Browning-Ferris Indus. of PA.*, 691 F.2d 1117, 1123 (3d Cir. 1982)).

71.  "Ultimate control is not necessarily required to find an employer-employee relationship under the FLSA, and even 'indirect' control may be sufficient.  In other words, the alleged

employer must exercise 'significant control.'" *Id.* (quoting *Browning-Ferris Indus. of PA.*, 691 F.2d at 1124).

72.   To determine whether individuals are joint employers, the Court looks at whether the alleged employer has:  "(1) authority to hire and fire employees;  (2) authority to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours;  (3) day-to-day supervision, including employee discipline;  and (4) control of employee records, including payroll, insurance, taxes, and the like." *Id.* at 469.

73.   However, "[a] determination as to whether a defendant is a joint employer 'must be based on a consideration of the total employment situation and the economic realities of the work relationship,'" and the above factors "do not constitute an exhaustive list of all potentially relevant facts, and should not be 'blindly applied.'" *In re Enterprise*, 683 F.3d at 469 (citing *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1469–70 (9th Cir. 1981)); *Nagel v. Ram Indus. Servs.*, No. 1:20-CV-840, 2022 U.S. Dist. LEXIS 130378, at *16 (M.D. Pa. July 21, 2022) (describing the "holistic approach" of the joint employment analysis and the Third Circuit's mandate to examine the circumstances "in light of the economic realities foregoing any narrow, crabbed, or technical distinctions").

74.   "[C]ourts should not be confined to 'narrow legalistic definitions' and must instead consider all the relevant evidence, including evidence that does not fall neatly within one of the above factors." *In re Enterprise*, 683 F.3d at 469 (quoting *Ling Nan Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71 (2d Cir. 2003));  *see also Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947) (explaining that whether an employment relationship exists under the FLSA "does not depend on . . . isolated factors but rather upon the circumstances of the whole activity").

75. "If a court concludes that other indicia of 'significant control' are present to suggest that a given employer was a joint employer of an employee, that determination may be persuasive, when incorporated with the individual factors." *In re Enterprise*, 683 F.3d at 470.

76. Here, the Defendants' own testimony and exhibits show that the Caregivers had consistent jobs, duties, interactions with Defendants, and were subject to the same pay practices when receiving paychecks from ERM and Staff Source.

77. Based on the four representative employees who testified, corroborated by Investigator Bibri's testimony about her investigation, and the other evidence presented at trial (including Defendants' own exhibits and testimony), the Court finds that the Secretary has established through a representative sample the pattern of the violation at issue here:  employees received two separate checks—one from ERM and one from Staff Source even though they were only working for ERM clients.

78. Defendants have not met their burden to show that certain Caregivers were excepted from this pattern.

79. First, the proposed distinction between English-speaking and Russian speaking Caregivers is superficial and only relates to which individual manager the Caregiver reported to.  This fact, by itself, has no determinative effect on the joint employment question at issue, because Defendants' own testimony and exhibits support the conclusions below, which are drawn from common practices for all of the Caregivers at issue.

80. Defendants' second distinction, that there was no testimony from a Direct Caregiver who did not live with the Client, is another distinction without a difference in this case.  Although Defendants spent much time articulating how they lacked control over "Direct Caregivers" because the consumer exercised the ultimate control, they articulated no specific reasons as

to why a live-in Direct Caregiver as opposed a non-live-in Direct Caregiver was or would be treated differently under Defendants' own employment practices.

81. Further, for the reasons below, the fact that a consumer exercises some modicum of control over a Direct Caregiver does not necessarily preclude the finding that other individuals (here, Defendants) are also employers under the *Enterprise* test.

82. Based on the facts and the economic realities in this case, whether a Caregiver was a "Direct Caregiver" as opposed to an "Indirect Caregiver" does not have a determinative effect on the joint employment question.

### C.  Conclusions of Law Regarding the *Enterprise* Test

83. The Court now turns to the substantive factors in the *Enterprise* test.

84. With respect to the authority to hire and fire, despite contentions that Direct Caregivers were "hired" by the consumer rather than the Defendants, Defendants exercised authority over the hiring of Caregivers, such as refusing to hire persons with criminal records or refusing to hire Direct Caregivers workers from Medicaid.  Finding of Fact ¶ 30.

85. Further, despite their assertions that that Staff Source was simply the financial intermediary for the Direct Caregivers, Defendants have maintained throughout this case that Staff Source did not simply "pay" the Caregivers, but also "hired" and "employed" them. Finding of Fact ¶ 27.

86. There are other indicia of significant control as it relates to the close relationship between ERM and Staff Source vis-à-vis their hiring practices.  For example, they shared the same employment application, except for the logo on the top—making the testimony at trial that Caregivers did not know they had filled out an application or did not recall applying to Staff Source more credible.  Findings of Fact ¶¶ 24, 28–29.

87. In addition, Ms. Zaydenberg motivated the Caregivers to apply to Staff Source to reduce the number of hours on ERM's payroll, so that ERM would not have to offer health insurance. Findings of Fact ¶¶ 12, 62–64.

88. For all of these reasons, the first *Enterprise* factor favors a finding of joint employment.

89. With respect to the second *Enterprise* factor, authority to promulgate work rules and assignments, and set conditions of employment, ERM determined what compensation ERM would be willing to pay a potential Caregiver;  controlled the time keeping systems that Caregivers were required to use;  and reported necessary information to particular agencies. Findings of Fact ¶¶ 31, 36.

90. Other indicia of significant control as it relates to the close relationship between ERM and Staff Source regarding this factor are that the Teletime reports did not distinguish whether hours should be paid by ERM or Staff Source;  ERM and Staff Source paid Caregivers the same hourly rates;  all training was conducted at the ERM Murray Avenue location;  and the only available handbook, applicable to all Caregivers, was ERM's handbook.  Findings of Fact ¶¶ 34–35, 37–41.

91. Thus, the second *Enterprise* factor favors a finding of joint employment.

92. With respect to the third *Enterprise* factor, day-to-day supervision, although all Caregivers had a manager, ERM did not "usually" call to check on the performance of the Direct Caregivers.  Findings of Fact ¶¶ 42–43.

93. Thus, the third factor of the *Enterprise* test slightly favors a finding of joint employment for the Indirect Caregivers, but not for those that were Direct Caregivers.

94. This distinction, however, when considered with the rest of the *Enterprise* factors and the other significant indicia of control, does not have determinative effect on the joint employment question here.

95. With respect to the fourth *Enterprise* factor, control of employee records, ERM and Staff Source shared the single Teletime account and Mr. Zaydenberg did payroll for both ERM and Staff Source by allocating the total Teletime hours between ERM and Staff Source. Findings of Fact ¶¶ 44–47, 49–52.

96. There are other indicia of significant control as it relates to the close relationship between ERM and Staff Source regarding the control of employee records.  The most concerning is that, at trial, there was no coherent explanation as to why and how the time worked by a given Caregiver was divided between Staff Source and ERM payrolls.  Rather, the testimony was limited to the facts that an unnamed "someone in the office" provided Mr. Zaydenberg with a "list" and then he divided the listed Caregiver's hours accordingly.  Findings of Fact ¶¶ 47–48.  This division of hours between the two payrolls inexplicably occurred *even when Caregivers served only a single ERM client*.  Finding of Fact ¶ 57.

97. Thus, the fourth *Enterprise* factor favors a finding of joint employment.

98. In addition to the four *Enterprise* factors discussed above, there are other indicia of significant control—outside of the four *Enterprise* factors—that also lead to the conclusion that ERM and Staff Source, together through their unusually close relationship, exerted significant joint control over the Caregivers.

99. In particular, during trial, Ms. Zaydenberg's disclaimer of any knowledge with respect to Staff Source or its operations, was not persuasive—she had discussed starting Staff Source with her daughter Ms. Simonds;  gave Ms. Simonds a significant amount of money to start

Staff Source;  provided ComForCare materials to Ms. Simonds;  and was unable to recall who, in the ERM office, gave Mr. Zaydenberg the "list" to divide the payroll between Staff Source and ERM.  Findings of Fact ¶¶ 9–13, 48, 54–55.

100. Further, Ms. Zaydenberg's disclaimer of any knowledge as to the Home Care Rule and her belief that the Direct Caregivers were not exempt is equally unpersuasive—she was a sophisticated businessperson;  paid overtime if more than 80 hours bi-weekly were recorded on the ERM payroll;  and paid overtime to Caregivers whom she allegedly believed were exempt "Direct Caregivers."  Findings of Fact ¶¶ 5–6, 136–138.

101. Additionally, the transactions between ERM and Staff Source also contribute to the finding of joint employment:  Staff Source did not have any of its own consumer clients and 99% of its deposits (over $3.3 million) during the relevant time period were from ERM's bank account.  Findings of Fact ¶¶ 60–61.

102. Finally, time and time again at trial, Ms. Zaydenberg repeated the overall purpose of working with Staff Source as a staffing agency—to reduce the number of hours on ERM's payroll so that the Caregivers would not lose their healthcare benefits.  Findings of Fact ¶¶ 12, 62–64, 105.

103. A natural consequence of reducing ERM hours by having Caregivers work for Staff Source (for the same clients, at the same rate, under the same supervision) was that when the Home Care Rule came into effect, the number of hours on ERM's payroll *necessarily* were not an accurate representation of the true hours worked and overtime was not properly awarded.

104. For the foregoing reasons, the Court concludes, by a preponderance of evidence based on the total employment situation (as informed by the *Enterprise* test and significant indicia of control) and economic realities of the work relationship between the Defendants and the

Caregivers, that Defendants used Staff Source as a payroll arm to circumvent the ACA hourly requirement, which meant that after the Home Care Rule came into effect, Defendants were circumventing the overtime requirements of the Home Care Rule.  For the foregoing reasons, the Court finds that the Defendants were joint employers under the FLSA and thus jointly liable for the payment of unpaid overtime hours.

III.    **FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING WILFULLNESS OF FLSA VIOLATION**

### A. Findings of Fact

105. Ms. Zaydenberg discussed with employees that ERM would be willing to enter into a relationship with a staffing company, so that they could work for ERM less than 40 hours per week and keep their insurance through the Exchange.  ECF No. 203 at 156:12-25.

106. Ms. Zaydenberg attended annual ComForCare conferences in 2015, 2016, and 2017, at which she attended at least one session on Department of Labor requirements.  ECF No. 203 at 159:2–161:4.  She testified "I do remember that I was on one session about some regulation of the DOL regulations [at a presentation by her franchisor]."  ECF No. 203 at 160:10–11.

107. Although she was required to comply with the ComForCare franchisor policies and received weekly updates from the franchisor, Ms. Zaydenberg did not always open or read the weekly email updates from the ComForCare franchisor.  ECF No. 203 at 207:8–208:6.

108. Based on Ms. Zaydenberg's demeanor during her trial, her testimony on her understanding of the Home Care Rule's applicability to the Caregivers and her inability to remember discussions regarding the Rule are not credible.  ECF No. 203 at 159:4–14, 207:8–208:6,

109. There were instances on the ERM and Staff Source payrolls where the combined bi-weekly hours between ERM and Staff Source for a given Caregiver never exceeded 80 hours (or 40 hours per week), ECF No. 202: 183:16–184:23, as well as instances where a Caregiver

worked for ERM for more than 80 hours in two weeks and was paid overtime (or 40 hours per week), while working for Staff Source less than 80 hours in two weeks (or less than 40 hours per week).  *See, e.g.* Ex. P-1 at DOL00146, DOL00153, DOL00403, DOL00404;  *see also* Ex. J-1 at CFC010944, CFC021394;  *see also* Ex. J-2 at SS012024.  As discussed below, the fact that some employees may have never been due overtime even when the ERM and SS payrolls are aggregated, and that some employees were paid overtime on the ERM individual payroll does not change the Court's finding that Defendants used Staff Source as a payroll arm to circumvent the ACA hourly requirement.

### B.  Conclusions of Law

110.  Under the FLSA, an action must be commenced within two years "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 129 (1988) (citing 29 U.S.C.S. § 255).

111.  An employer violates the FLSA if, at a minimum, "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA.]"  *McLaughlin*, 486 U.S. at 132–33;  *Stone v. Troy Constr., LLC*, 935 F.3d 141, 148–51 (3d Cir. 2019).

112.  Conduct need not be egregious to establish willfulness, *Stone*, 935 F.3d at 149, but willfulness requires a more specific awareness of the legal issue than a general awareness.  *Souryavong v. Lackawanna Cty.*, 872 F.3d 122, 127 (3d Cir. 2017).

113.  The Home Care Rule, 29 C.F.R. § 552.109, had an effective date of January 1, 2015, but the Department of Labor began enforcing it on November 12, 2015, following the resolution of legal challenges to the Homecare Rule.  *See Home Care Ass'n of Am. v. Weil*, 76 F. Supp. 3d

138 (D.D.C. 2014);   *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084 (D.C. Cir. 2015); Application of the Fair Labor Standards Act to Domestic Service;   Dates of Previously Announced 30-Day Period of Non-Enforcement, 80 FR 65,646 (Oct. 27, 2015).

114. Ms. Zaydenberg could not reasonably have been unaware of the Home Care Rule given weekly emails from the ComForCare franchisor, her attendance at ComForCare annual conferences, and the fact that ERM did in fact pay overtime when Caregivers had more than 80 hours over a bi-weekly period on only their ERM paycheck.  Findings of Fact ¶¶ 106– 109.  The latter fact, in particular, means that Ms. Zaydenberg knew that Caregivers were in fact owed overtime.

115. Although the creation of Staff Source and the Staffing Agreement predate the Home Care Rule's effective date, Ms. Zaydenberg has consistently maintained that the purpose of such an arrangement was to limit the number of hours Caregivers worked.

116. Following the implementation of the Home Care Rule, the continued use of such an arrangement, which continued to limit the number of hours Caregivers worked for ERM, showed reckless disregard with respect to Defendants' obligation to pay overtime hours pursuant to the Home Care Rule.

## IV.    FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING AMOUNT OF BACKWAGES

### A.  Findings of Fact

117. The hours and pay on the payroll records of ERM and Staff Source accurately reflect the bi-weekly hours worked by the Caregivers in each pay period and the pay that the Caregivers received.  ECF No. 136 ¶¶ 8–11;  Ex. J-1 and J-2 (sample of voluminous records).

118. To determine whether back wages were due, Investigator Bibri reviewed Defendants' pay records, ECF No. 202 at 84:15–16, 137:16–18, and not the time records because ERM did

not maintain paper timesheets by employee and had not separately recorded employee time worked per week.  ECF No. 202 at 100:4–101:22.

119.   To determine how much time Caregivers worked in any given week, Investigator Bibri divided the bi-weekly pay period records in half, which is the most favorable method to Defendants of calculating possible overtime due.  ECF No. 202 at 133:9–10, 133:18–134:5, 137:20;  Ex. P-1.

120.   Exhibit P-1 sets out, employee by employee, the amounts actually paid to each employee, including regular hourly pay and, if overtime premium pay was paid, the amounts of premium pay.  Ex. P-1;  ECF No. 202 at 140:23-25.

121.   If an employee worked more than 40 hours in a week and did not receive overtime pay, or did not receive correct overtime pay, Investigator Bibri calculated back wages due using a formula in the computation spreadsheet, multiplying overtime hours by half of the employee's regular rate and then crediting Defendants for any pay in the payroll records that was listed as "overtime."  Ex. P-1;  ECF No. 202 at 140:2–25.

122.   Defendants do not challenge the methodology used by Investigator Bibri to calculate back wages.  ECF No. 214 ¶ 148.

123.   Back wages per Caregiver are on each Caregiver's page(s) in Exhibit P-1 and are summarized in Exhibit P-2.  Ex. P-1;  Ex. P-2.

### B.  Conclusions of Law

124.   The FLSA requires that an employer shall not subject its employees to a workweek of more than forty hours, without compensating the employees at an overtime rate of not less than one and one-half times the regular rate at which he is employed.  29 U.S.C. § 207(a)(1).

125. Having found that the Defendants are joint employers under the FLSA, *see* Conclusion of Law 104, who are jointly and severally liable for the FLSA violations and considering the back wage calculations, the Court concludes that the Caregivers are due $1,242,146.61 in back wages.

## V.  FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING LIQUIDATED DAMAGES

### A. Findings of Fact

126. Ms. Zaydenberg and ERM were previously investigated by the Department of Labor Wage and Hour Division for failure to pay FLSA overtime premium pay and agreed to pay back wages after the investigation.  ECF No. 203 at 115:6–8;  ECF No. 204 at 10:19–11:2;  Ex. D-16.

127. Former Investigator Edwin Chow told Anna Zaydenberg at the time of the previous investigation in 2009–2010 that the FLSA required overtime premium pay for all hours worked over 40 in a workweek for non-exempt employees.  He calculated back wages for five office employees, which ERM paid.  Ex. D-16;  ECF No. 204 at 10:25–11:2, 32:11–16.

128. Following the 2009/2010 investigation, Ms. Zaydenberg corresponded with Mr. Chow on occasion regarding wage and hour issues up until January 2014.  ECF No. 203 at 130:12–20; 132:25–133:5;  ECF No. 204 at 74:8–14.

129. Matthew Simonds is the son-in-law of Ms. Zaydenberg and the husband of Ms. Simonds. He is a lawyer but is not paid to provide legal services to ERM.  ECF No. 214 ¶ 122.

130. Ms. Zaydenberg did not know if Mr. Simonds was a lawyer specialized in labor law compliance, rather she only knows that he was a prosecutor in a branch of the military.  ECF No. 203 at 208:13–25.

131. In 2016 during dinner, Ms. Zaydenberg discussed overtime requirements for live-in Caregivers with Mr. Simonds.  ECF No. 204 at 30:10–31:11.

132. Mr. Simonds sent an email to Ms. Zaydenberg on July 20, 2016, before the Department of Labor's investigation in this case began in June 2017, *see* Ex. D-12, stating that "[i]t doesn't look like you have to pay overtime to employees who live with and take care of their family members."  Ex. D-4.

133. This e-mail contained a link to a Department of Labor pamphlet on the application of the home care rule to overtime payments.  The pamphlet makes clear that a third-party employer such as an agency hiring a caregiver must comply with the FLSA's minimum wage and overtime requirements.  Ex. D-4;  Ex. J-5 at 4, 18, 32.

134. One time at a ComForCare conference (sometime between 2013 and 2017), Ms. Zaydenberg spoke briefly with the presenting attorney after an information session on DOL regulations and believed based on this conversation that her business was in compliance.  ECF No. 203 at 159:19–161:4.

135. Other than the above instances (Findings of Fact ¶¶ 126–134), there is no evidence that Defendants consulted with any attorney, accountant, or other person or party knowledgeable about FLSA compliance during the relevant time period.  ECF No. 203 at 166:11–14;  ECF No. 204 at 32:3–10.

136. Defendants not only paid certain Caregivers overtime, but also did not produce any required "Live-In Employee Exemption Forms" for such Caregivers despite Defendants' claim that certain employees were exempt pursuant to guidance from the Pennsylvania Department of Human Services.  ECF No. 214 ¶¶ 101–103.

137. Based on Ms. Zaydenberg's demeanor during trial (and the lack of Live-In Employee Exemption forms, ECF No. 204 at 8:9–13), Ms. Zaydenberg's belief that domestic service employees who live in the same residence as the consumer they serve are exempt from overtime under the FLSA is not credible. ECF No. 203 at 108:20–111:3.

138. Based on Ms. Zaydenberg's demeanor during trial (and the failure to provide Live-In Employee Exemption forms), Ms. Zaydenberg's assertions that certain live-in Caregivers were paid overtime as a mistake is not credible. ECF No. 203 at 221:3–23; 213:12–214:13, 218:8–12 (Labbie); ECF No. 203 at 198:24–199:30 (Adhikari); ECF No. 203 at 71:9–16, 31:14–18, 223:15–1 (Biswa); ECF No. 203 at 221:3–23; Ex. J-1 (CFC021394, Labbie); Ex. J-1 (CFC010944, Biswa).

### B. Conclusions of Law

139. Under 29 U.S.C. § 216(b), "[a]ny employer who violates the provisions of section 207 of this title shall be liable to the employee or employees affected in the amount of their . . . unpaid overtime compensation . . . and in an additional equal amount as liquidated damages."

140. "To avoid mandatory liability for liquidated damages, an employer must show that it acted in good faith and that it had reasonable grounds for believing that it was not violating the Act." *Sec'y United States DOL v. Am. Future Sys.*, 873 F.3d 420, 433 (3d Cir. 2017) (citing 29 U.S.C. § 260 and *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1299 (3d Cir. 1991)).

141. "The good faith requirement is a subjective one that requires that the employer have an honest intention to ascertain and follow the dictates of the [FLSA]. … The reasonableness requirement imposes an objective standard by which to judge the employer's conduct … Ignorance alone will not exonerate the employer under the objective reasonableness test.

*Brooks v. Vill. of Ridgefield Park*, 185 F.3d 130, 137 (3d Cir. 1999) (internal quotations omitted).

142. "In determining an employer's subjective good faith," the employer must have had "an honest intention to ascertain and follow the dictates of the FLSA." *Id.* (citing *Marshall v. Brunner*, 668 F.2d 748, 753 (3d Cir. 1982).

143. To satisfy the objective reasonableness standard, "the employer must act as a reasonably prudent man would have acted under the same circumstances." *Id.* (internal citations and quotations omitted).

144. "An employer's failure to take 'affirmative steps to ascertain the legality of its pay practices' mandates an award of liquidated damages." *Souryavong v. Lackawanna Cnty.*, 872 F.3d 122, 125 (3d Cir. 2017) (citing *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 910 (3d Cir. 1991)).

145. "If the employer fails to come forward with plain and substantial evidence to satisfy the good faith and reasonableness requirements, the district court is without discretion to deny liquidated damages." *Brooks v. Vill. of Ridgefield Park*, 185 F.3d 130, 137 (3d Cir. 1999) (internal quotations omitted); *see also Sec'y United States DOL v. Am. Future Sys.*, 873 F.3d 420 (3d Cir. 2017).

146. The Court gives Ms. Zaydenberg's phone calls to Mr. Chow, which significantly predate the relevant time period, little weight.  Finding of Fact ¶ 128.

147. During the relevant time period, other than interacting with a ComForCare conference presenter once and receiving a FLSA pamphlet from her son-in-law following a dinnertime discussion, Ms. Zaydenberg did not take any affirmative steps to ascertain the legality of the

Defendants' pay practices, such as consulting with any attorney, accountant, or other person or party knowledgeable about FLSA compliance.  Finding of Fact ¶ 135.

148. Such sporadic and limited interactions with persons with whom Ms. Zaydenberg may have discussed some aspect of the FLSA, over the course of the relevant time period, do not show that Ms. Zaydenberg had an honest intention to ascertain and follow the dictates of the FLSA or that she was acting as a reasonably prudent person would have under the same circumstances.

149. Further, even though Mr. Simonds' email to Ms. Zaydenberg stated that "[i]t doesn't look like you have to pay overtime to employees who live with and take care of their family members," Ex. D-4, this was contradicted by the plain language of the Department of Labor pamphlet, which makes it clear that that a third-party employer (such as an agency) hiring a caregiver must pay overtime.  It is also contradicted by the fact that ERM actually did pay overtime to such live-in Caregivers, when they worked more than 80 hours in two weeks.  Findings of Fact ¶¶ 129–133, 136–138.

150. Finally, the express purpose of the Staffing Agreement was to reduce the hours worked by Caregivers on ERM's payroll following the passage of the ACA.  No reasonably prudent person running a large business in a heavily regulated industry would have continued to reduce the hours on ERM's payroll by allocating a portion of hours to a different company following a significant FLSA change in the industry without considering the consequences or consulting with someone on the effects of limiting the hours on FLSA overtime requirements.  Findings of Fact ¶¶ 12, 62–64, 105.

151. The Court finds that Defendants have failed to come forward with plain and substantial evidence to satisfy both the subject good faith requirement and the objective reasonableness

requirement, and thus the Court will award $1,242,146.61 in liquidated damages, which is an amount equal to the back wages owed.  *See* 29 U.S.C. § 216(b).

## VI.  FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING RECORDKEEPING VIOLATIONS

### A.  Findings of Fact

152. Defendants maintained payroll records organized by two-week pay period, which do not show hours worked per day or per workweek. Ex. J-1;  Ex. J-2.

153. ERM received all employee time records either through paper timesheets or Teletime.  ECF No. 203 at 5:22–6:2,182:14–23.

154. After the paper timesheets were used to generate the payroll, they were organized by customer and stored in at ERM's Murray Avenue location.  ECF No. 203: 8:4–8.  The Teletime reports are not physically filed anywhere but are maintained in the Teletime program.  ECF No. 203 at 8:12–15.

155. Ms. Zaydenberg explained to Investigator Bibri that ERM is required to keep time records organized by consumer pursuant to Medicaid requirements.  ECF No. 202 at 158:19–159:2.

156. Although using the records kept by ERM, it would be theoretically possible to compile each Caregiver's records to demonstrate the daily and weekly amounts that each Caregiver worked, ECF No. 202 at 159:22–160:2, to determine the actual time worked per workweek, someone would have needed to combine the Teletime record and paper timesheets for each Caregiver workweek, which would have taken a significant amount of time.  ECF No. 203 at 176:3–177:16.

157. Investigator Bibri asked Ms. Zaydenberg if ERM would reorganize the paper time records by Caregiver, but Ms. Zaydenberg declined to do so because she and her staff at ERM could not devote the time needed to that task.  ECF No. 202 at 100:21–24.

158. Investigator Bibri estimated that it would have taken her months to search and sort the boxes of paper timesheets and then combine them with electronic timesheets, and that the paper timesheets were stored in hundreds of boxes by client, not by Caregiver.  ECF No. 202 at 100:25–14.

159. During the investigation, Defendants never provided the Secretary with complete employee time records organized by Caregiver, nor have they done so as part of this litigation.  ECF No. 202 at 100:4–8.

### B. Conclusions of Law

160. Pursuant to 29 U.S.C. § 211, "[e]very employer subject to any provision of this Act or of any order issued under this Act shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the [Secretary].…"  29 U.S.C. § 211;  *see Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 128 (3d Cir. 1984) (explaining that § 11(c) "requires employers to maintain accurate records to ensure that all workers are paid the minimum wage for every hour worked"), *abrogated on other grounds, Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982).

161. Pursuant to 20 C.F.R. § 516.1(a), "no particular order or form of records is prescribed … [h]owever, every employer subject to any provisions of the [FLSA]…, is required to maintain records containing the information and data required by the specific sections of this part…[;] provided that that extensions or transcriptions of the information required by this part are made available upon request."

162. The employment records must include, among other information, employees' hours worked per day, hours worked per week, total daily or weekly straight time, and overtime premiums due. *Stewart v. Loving Kindness Healthcare Sys.*, Civil Action No. 2:20-cv-1087-RJC, 2021 U.S. Dist. LEXIS 28050, at *9 (W.D. Pa. Feb. 16, 2021) (Colville, J.) (citing 29 C.F.R. §§ 516.2(a)(7)-(9)).

163. With respect to Defendants' payroll records, they show neither the "[h]ours worked each workday and total hours worked each workweek," which violates 20 C.F.R. § 516.2(a)(7), nor "[t]otal daily or weekly straight-time earnings or wages due for hours worked during the workday or workweek, exclusive of premium overtime compensation," which violates 20 C.F.R. § 516.2(a)(8). Findings of Fact ¶¶ 152–159. Instead, these payroll records show the hours worked and wages due for an aggregate two weeks. *Id.*

164. With respect to Defendants' time keeping records, although it is conceptually possible to determine the hours worked each workday and total hours worked each workweek by adding each Caregiver's Teletime card and paper time sheets (after reorganizing them by Caregiver instead of client), during the investigation, Defendants did not provide records showing such aggregation and refused to so compile the documents, Findings of Fact ¶¶ 152–159, which violates the FLSA's recordkeeping requirements. *See Acosta v. At Home Pers. Care Servs., LLC*, No. 1:18-cv-549 (LMB/IDD), 2019 U.S. Dist. LEXIS 65098, at *40 (E.D. Va. Apr. 15, 2019) (finding, where records were organized by patient instead of caregiver, that the inability to "offer the DOL investigator, the Secretary, or even the Court a single, organized, comprehensive set of records showing how many hours each employee worked per day and per week" was a FLSA record keeping violation); *see also Walsh v. Indep. Home Care of Mich., LLC*, No. 20-10170, 2022 U.S. Dist. LEXIS 88634, at *18 (E.D. Mich. May 17, 2022)

28

("The purpose of the recordkeeping regulations is so that anyone, whether it is an employee or DOL investigator, can look at the records and easily determine how many hours the employee worked.").

## VII.        CONCLUSIONS OF LAW REGARDING ISSUANCE OF AN INJUNCTION

165. "The FLSA authorizes district courts to issue injunctive relief 'restrain[ing] violations' of §§ 206, 207, and 211(c) upon a showing of cause." *Solis v. A-1 Mortg. Corp.*, 934 F. Supp. 2d 778, 816 (W.D. Pa. 2013) (citing 29 U.S.C. § 217).

166. "Where the Secretary has established violations of the Act, the district court should ordinarily grant injunctive relief, even if the employer is in present compliance, unless the district court is soundly convinced that there is no reasonable probability of a recurrence of the violations." *Marshall v. Van Matre*, 634 F.2d 1115, 1118 (8th Cir. 1980).

167. "Whether to grant an injunction is within the court's sound discretion." *A-1 Mortg. Corp.*, 934 F. Supp. 2d at 815.

168. "Factors that district courts consider in deciding whether to issue an injunction include the employer's past conduct, current conduct, and, most importantly, whether the employer can be counted on to comply with the FLSA in the future." *Reich v. Petroleum Sales, Inc.*, 30 F.3d 654, 657 (6th Cir. 1994)." *Id.*

169. As the United States Court of Appeals for the Fifth Circuit has stated:  "The issuance of a permanent injunction in FLSA cases does not subject an employer against whom it runs to a penalty or hardship since it requests him to do what the Act requires anyway—to comply with the law." *Dunlop v. Davis*, 524 F.2d 1278, 1281 (5th Cir. 1975).

170. One set of Defendants—Ms. Zaydenberg and ERM—were already found to have violated the FLSA once before.  Findings of Fact ¶¶ 126–127.

171. Here, as Defendants have maintained throughout trial, the Staffing Agreement was *intentionally* entered to reduce the number of hours on ERM's payroll due to the ACA. Findings of Fact ¶¶ 12, 62–64, 105.  Nothing else changed for the Caregivers, except that when the Home Care Rule came into effect, they were not paid overtime they were due.

172. In light of this purposeful scheme and the previous violation, the Court finds, in its discretion, that an injunction is appropriate under 29 U.S.C. § 217.  *See A-1 Mortg. Corp.*, 934 F. Supp. 2d at 815 (issuing injunction against defunct defendant company).

**VIII.       CONCLUSIONS OF LAW REGARDING WAIVER**

173. According to the Court of Appeals for the Third Circuit in *Robinson v. Johnson*, 313 F.3d 128 (3d Cir. 2002):

> although "[p]arties are generally required to assert affirmative defenses early in litigation, so they may be ruled on, prejudice may be avoided, and judicial resources may be conserved," *Robinson v. Johnson*, 313 F.3d 128, 134 (3d Cir. 2002), a district court may permit a defendant to raise an unpled defense by way of a post-answer motion so long as it is raised "at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond." *Charpentier v. Godsil*, 937 F.2d 859, 864 (3d Cir. 1991) (brackets in original) (quoting *Lucas v. United States*, 807 F.2d 414, 418 (5th Cir. 1986)).

174. "[A]ffirmative defenses can be raised by motion, at any time (even after trial), if plaintiffs suffer no prejudice."  *Cetel v. Kirwan Fin. Group, Inc.*, 460 F.3d 494, 506 (3d Cir. 2006).

175. Here, Defendants challenge the validity of the Home Care Rule as an unlawful extension of the Department of Labor's authority.  ECF No. 213 at 14–18.  Defendants contend that this defense was necessarily a part of their Answer's fourth affirmative defense when they argued that the claims are barred in whole or in part to the extent that the Caregivers are exempt from FLSA coverage.  ECF No. 8 at 4.

176. However, as the Court previously ruled when it denied Defendants' prior motion to stay, ECF No. 74, Defendants could have made this argument earlier, but did not do so. ECF No. 93 at 5.

177. Further, Defendants could have raised this defense at any point in time in this litigation, including in their attempt to amend their pretrial narrative, *see* ECF No. 172, but failed to do so even though they were on notice of this issue at least as of December 2020 when they filed their motion to stay and the Court denied them leave to file an interlocutory appeal. *See* ECF Nos. 74 & 94.

178. Defendants' argument is essentially that, because this is a legal issue there is no prejudice in raising this defense post-trial. ECF No. 221 at 1. Even if that were the case,[5] by waiting until after the trial (a trial in which the parties, their counsel, their witnesses, and the Court all expended significant resources) to raise the invalidity of the Home Care Rule, Defendants failed to "assert affirmative defenses early in litigation, so they may be ruled on, prejudice may be avoided, and judicial resources may be conserved." *Robinson v. Johnson*, 313 F.3d 128 (3d Cir. 2002).

179. Accordingly, the Court will not permit Defendants to challenge the validity of the Home Care Rule as an unlawful extension of the Department of Labor's authority.

---

[5] The Court is not entirely convinced that there would remain no open questions of fact (and thus, no prejudice to the Department of Labor) on this point based on post-close of discovery filings related to this issue. *Compare* ECF No. 75 at 3 (contending, in their brief on the Motion for Emergency Stay, that "90% of the workers on the DOL's Schedule A in this Action are home health care workers who once fell within the FLSA's Companionship Exemption") *with* ECF No. 221 at 2 ("The issue regarding the validity of the Homecare Rule is interjected with the Affirmative Defense that the Caregivers are exempt; as Defendants argue (and the DOL does not appear to dispute) that the Caregivers are exempt if the Homecare Rule is invalid.")

An appropriate order will follow.

DATED this 5th day of August, 2022.

BY THE COURT:


/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge


cc (via ECF email notification):

All Counsel of Record